Next case today is case number 4 1 4 0 6 0 0 in re the state of Schutzbach. Did I pronounce that correctly? For the appellant we have Kara Schof and for the primarily in Mattoon, Illinois, both in Coles and Clark County. I do sometimes go to Marshall as well. I initially became involved in this case as the attorney for the original independent executor Marita Stoltz. She was nominated under the original will. I understand that you are aware of the facts so I won't belabor those for you here and now. However, I would like to recite for your benefit the standard of review. Of course we did assert and propound that the will was the deceased. It was overturned at our jury trial that occurred approximately a year ago at the end of March. I did numerous times request and in particular for relevance of today I asked the judge to enter a JNOB, judgment not withstanding the verdict. I did so after within the within the proper time limit and of course that was denied. I also alternatively requested a new trial that also was denied. I bring that to you today. The first relevant to the JNOB, you're looking at that under the de novo standard. Essentially the standard of review for you is whether or not and looking at the facts as presented in the light most favorable to the will contestant, is it true that I would submit to you that the verdict should have been in our favor? That in fact that there should never have been under any set of facts similar to those presented a verdict in favor of the plaintiff and I would submit to you that I believe that it's true. So you're saying even with the facts contrary to your client's position they were not sufficient for the case to go to the jury? In this particular case I believe the facts as presented were insufficient to ever be presented to the jury. I requested a directed verdict to close my case believing that they did not in fact carry their original burden and burden and then again after we received the I again asked for JNOB believing again and making that same assertion. And the reason that I feel that, and I understand it's an exceptionally high hill to climb since we've submitted it to a jury and the jury came back contrary to what I requested, but in this case I believe if you look at the law and you apply the facts even giving them every single one, and in fact that's how I did my closing, I presented to the jury and said I will give them everything that they are presenting is true. Under those facts and circumstances in this case it's insufficient for a few reasons. Well three of the witnesses who purportedly at least of all witnesses knew Decedent best seem to suggest through testimony that Decedent was not competent at the time of the will. Why isn't that enough for it to at least go to the jury? In this particular instance sir there is for example Malone versus Malone and some of the others that I've cited in my brief, the courts have expressly come down and said a general opinion from a fact witness is insufficient unless they can present evidence, incidents to support that overall general opinion. In particular with respect to Mr. Iwan, he presented an opinion that he said he felt he would have been incompetent of understanding his assets and generally signing a will. But when pressed about the conversation that he had upon which he based that opinion he couldn't hardly remember the conversation. It wasn't noteworthy enough to him to be able to say you know what he couldn't recognize me, he got my name incorrect, he was incorrect on the facts that we discussed. In fact his testimony was we reminisced about old times and essentially that it was an appropriate conversation. And so the general opinion without sufficient factual support and incidents to go along with that is not sufficient. With respect to Mr. Alvin, that would have been the other one I think that you're referring to, he generally also said I saw him in I think it was early June or even early or middle of May, he was fine and then I saw him again. First of all he couldn't give us a specific time period when he did see the decedent. He believed generally he saw him after he came back from Cherville, which they went to Cherville on the 11th and 12th, the will was signed on the 13th. He thought it was perhaps the week after he came back. So his time period was not nailed down. Secondly Mr. Alvin based his opinion and it's the same issue that I would But then again when pressed on the facts and incidents on why he believed that to be true, he simply said that he had an unreasonable belief that his expenses, regarding his expenses. There was never any, he also went on to say that he didn't know about the man's expenses, that he wished he would have sat with him and done a balance sheet. He was unaware of what really Jim had and also what the expense was that was involved. So why he believed this to be an unreasonable thing is not in the record. And so what about when he was signing the documents for his business partner? What about that evidence? I think that would have been the third witness that that was presented. The issue there, that happened on the 17th. So that was actually four days after and it is a fairly rapidly, fairly rapid progressing disease. There was no evidence prior to the 13th is my assertion. Then when you get to the 17th, the business partner is saying to us, he also testified, I would not have presented him with documents if I didn't believe he was not able to understand them. So he presents him with documents, but then the story if you read his testimony is very clear that Jim was fine at the beginning of the meeting. The issue was as the meeting wore on, he'd had a long day and in his opinion was that the disease at that point was manifesting in a fatigue, that he signed too long, that his signature went on too long. And so everyone it seems to agree that Jim's disease manifested in fatigue and being worn down, sleepiness. So that fits with a physical manifestation, but then again even business partner said, I presented that day with documents. I believe he understood what we were doing at the beginning. It was towards the end that he started to show fatigue because he couldn't stop the pen. So even with that witness, we still have no evidence of mental diminishment. There's never anyone who comes forward and says, he didn't recognize me. Our conversation was socially inappropriate. He couldn't set forth his assets and he didn't have a true grip on his expenses. In fact, interestingly, Jim in all of his conversations consistently recited what he had. He would say, I have a boat, here's where I want this to go. I have Charleston Service Center, here's where I want this to go. And so there's nothing in the record that will permit you for lack of testamentary capacity to conclude that he didn't know the natural objects of his bounty, that he didn't know the true makeup of his assets, or that he couldn't come up with a planned form disposition for those things. The other issue, undue influence. Interestingly, there are two things that are missing on the undue influence part. Dominance and dependence, use of dominance and dependence to procure the will. Simply put, all of the witnesses that were caused to testify seemed to all line up that Marita loved him, she cared for him, she was with him. But ultimately, when she came to stay with him on the 6th, she still was taking care of her own business matters, she was leaving him in the care of custody of friends and family. The only thing she was truly doing in terms of assisting him was she was filling his pill minder. She also did, they had a joint account, she took over paying some of his bills. She signed the checks. But the only testimony with respect to the finances is simply that she did it for his convenience and that he knew exactly what she was doing. There's no evidence in the record of dominance and dependence. This exact factual scenario has played out multiple times where they looked for dominance and dependence, and in particular, in this case, I think the Baumgarten case is particularly instructive. In that case, the decedent told his kids they would each get a million dollars, and it didn't happen. It went to the wife. They alleged that she was dominating him because she was preparing meals, helping him while he was ailing, driving him to different things. The first district in that case came down and said, dependence requires dominance. It's not just enough that you have an ailing testator. If that were sufficient, in nearly every case, we would have a will that would be suspect. And in this case, she was his significant other. The law clearly says there's a presumption in favor of the will. There's even a presumption in favor of a will in favor of a significant other, and that were to presume the testator was sane. In this case, it's felt like from the beginning the contrary has been required. That I have initially been required to carry the burden of proof to prove that Jim was sane, and that the will was truly his. When in fact, I do not believe that at any point the burden of proof was properly met to show that Jim lacked the capacity, simply because Jim has always, throughout the entire record, even up until the 20th of June, been able to recognize family, been able to set forth properly his assets and that of his estate, and independently meet with his attorney to go through those things and how he wanted them to be handled. When you talk about undue influence in Baumgarten, they said it must, the dependents must be present at the time the will was signed, such to impair the free will of the testator. And here that simply was not true. I think that that can... You argued two different grounds in an effort to invalidate the decedent's capacity as well as undue influence. And they also argued undue influence? Correct. And when the jury returned a general verdict, would either of those be adequate to support the claim to undo the will? That's true. They only had to find on one of the two. Regarding all the deficiencies you've mentioned and potential problems with the testimony, since you were trial counsel and record shows apparently you argued all of these vigorously to the jury. Yes. How can we, in view of all that, second-guess the jury's determination that notwithstanding this, this is what they concluded? Simply put, Your Honor, they were not presented with the different cases in closing. And I think that this court... They were not presented with what? They were not presented with these cases in closing. They were presented with the jury instructions. We made general argument. But the fact of the matter is, I think they got it wrong in that there was a lot that went on through the course of trial that I think were mere distractions. We talked a lot about a bisell agreement. We talked a lot about the inner workings of a business relationship. We talked a lot about different factual things that I think ultimately distracted from the underlying issue. We don't have any issue before us, however, do we, that raises a question regarding the improper admission of any of this evidence? No, I don't think it was improper. Well, then the jury, for lack of a better way to put it, heard the case. They heard the case, warts and all. It looked to me, looking at this case, that there were lots of problems with all of these witnesses for one reason or another, as you have pointed out now, and I'm sure we'll hear from other counsel about this as well. Maybe there were distractions. I guess there are always distractions in any case, but it's hard to second-guess a jury's determination. This is a panel that has lots of experience in jury trials, and I don't know, especially given, you know, it's a two-edged sword. Sounds to me like they did a hell of a job at the trial. So, what then? They heard it all, and they still accepted the challenges. I agree with you, and I agree it's a high hill to climb. That's why I didn't file this appeal lightly, and ultimately, when I'm standing here today, and I continue to review these cases, frankly, I submitted these cases to the trial court as well, on three different occasions, and so I agree completely with what you're saying. I've been told no four times, whether it be by the judiciary or the jury, but the fact of the matter is, I've lived with these cases now for three years, and I cannot, in my head, reconcile this factual scenario with the precedent that we're dealing with. Let me be even more clear. This is the manifest weight of the evidence standard, isn't that? It is, with respect to ordering the new trial. Well, it seems to me this is one of those cases where whatever verdict the jury had returned would fall within that continuum that, as an appellate court judge, I'd say, good here, because the jury heard something they could have believed if they'd chosen that would have been a basis to support the plaintiffs, and something that would have been a basis to support the police. That's why they resolve it. I understand that. My issue, Your Honor, is that I believe that this is not a case that should ever have been submitted to a jury. I think the judge should have taken it away from them, simply because I do not believe the facts were sufficient in order to permit it to go forward. There's no evidence, in my opinion, with respect to lack of testimony or incapacity, simply because those three subparts, there's no supporting evidence that Jim ever got anyone incorrect. Well, I want to draw a distinction for a moment between a motion for judgment, NLV, at the end of all of the evidence, and a motion for judgment, NLV, at the end of the plaintiff's case. I understand you're arguing that the court erred by denying a motion for judgment, NLV, at the close of the plaintiff's case? At the close of all evidence, sir. Close of all? Yes. Okay. Go ahead. So, the issue here is one that I believe, I understand, we have a huge high health decline, and so I agree with you on with respect to respecting jury verdicts and all of that that's necessary. I simply do not believe, when you look at the outstanding law, when you look at the prior case precedent, that it supports the jury verdict. What's your best case? I'm sorry? What's your best case? My best case that I would cite for you is the Lemke case. Okay. I feel like... I found the issue of requesting a new trial seemed to be a dual standard of review. Is the question before this court is, did the trial court abuse its discretion by finding the jury verdict was not against the manifest weight of the evidence? That's the alternative relief that we're seeking, yes. So I feel that the court abused its discretion in upholding the jury verdict by finding that the verdict was not against the manifest weight of the evidence, correct. Okay. My initial argument, frankly, is I would prefer the JNOV because of the way the law sets up in this case. If you don't prevail in this matter, is the decedent intestate then? Correct. And the decedent has two surviving parents, or at least dead at the time of his death, and four siblings, correct? Yes, sir. Is it my understanding then, under the laws of descent and distribution, no spouse, no children, is it like half to the parents and then the other half to the four siblings? You've got it exactly correct. Is there anything in the record, anything at all, which would indicate that the decedent here intended his parents to have any part of this estate? There's nothing in the will. There's been no testimony consistent with that. Is there anything in the record, anything at all, which would indicate that the decedent wished for two of his siblings to take anything from his estate? Same thing, Your Honor. There's nothing in the record nor in the previous will. Okay. I'll follow those questions up with opposing counsel, Mr. McDevitt. He's before us. Go ahead. I feel as though I have, in my brief, gone through a bunch of different cases where they've looked at directed verdicts, J&OBs, when it was appropriate to take it away from the jury because I agree with you, I think it is a dramatic remedy. And so I would implore the court to go through those different cases cited and see that the facts in this case are directly comparable to those that I've cited for you and it is for that reason I'm asking you to enter the J&OB. Thank you. Thank you, counsel. You will have rebuttal. Mr. McDevitt. Thank you, Your Honor. May it please the court and counsel. My name is Dave McDevitt. I represent Robert and John Schutzbach, who are also present this afternoon with their spouses. I likewise practice further south from here in Effingham. I have been involved in this case from the beginning. I was the trial counsel at this jury trial just under a year ago. And I apologize, I can't see anymore so I have to use my glasses to read but look at you otherwise. Your Honor, I will get right to some of the points raised by Your Honor's questions. First of all, with respect to what is the best case that exists for the appellant, I would suggest that none of the cases cited support exactly the remedy that is being requested here. There are no cases cited that are directly procedurally on point where the appellate court has overturned the denial of a motion for judgment notwithstanding the verdict after a jury trial. The closest case that comes along procedurally is the Mitchell v. Van Sack case, which is directly analogous to this case and that's where the verdict, a jury verdict was entered for the plaintiff in validating a will. There was a motion for a judgment notwithstanding that verdict. The court denied it and the appeal followed. The appellate court affirmed the trial court's denial of the motion for J&OB in that case. The other cases are either pleading cases, summary judgment cases, direct verdict cases, none of which are analogous to what we have here. And most of which, and I think this is probably the case with many will contests, if not all will contests that actually go to trial, there are a million facts for every case. And they're all different. You can cherry pick, this is one of the complaints in the appellant's brief that I'm cherry picking the evidence, but there are components of all of those cases, factual components, that are similar to what we have here. But overall, none of them are identical, of course, and that's why we have a jury trial. And again, to your Honor's point, I agree, this is why we have a jury trial, because the facts are in dispute. And it is up to the jury to decide. The case that was referred to by counsel, the Lemke case, demonstrates my point here. Of course, that was not a J&OB case after the jury reached a verdict. In fact, the jury failed to reach a verdict in that case and then the court directed a verdict for the defendants. And validated the will. However, there were dissimilarities there too. The court found it significant that testamentary capacity was not an issue in that case, only the undue influence. And the court found it factually significant that the alleged influencer didn't receive a benefit under that will. I'm not sure why it was contested in that case if she didn't receive a substantial benefit, but nevertheless, that was significant for the court. I'll go back and start. When I look at these things, it's easy for me to gloss over what the standard really is. But when you look at it piece by piece, I think it becomes clear what needs to happen here. You know, what the court must do here is take all reasonable presumptions and inferences. That's the important part of our undue influence count of this case. What inferences can be drawn that tend to establish the allegations of the complaint. If there are any, much of the language in these cases, is there any evidence or inferences to be drawn from that evidence that tend to establish the allegations of the complaint, then it goes to the jury. And that's exactly what happened here. I readily admit that undue influence cases are difficult to prove. And the reason is, if someone is exerting undue influence over a decedent, it's unlikely they're going to put a gun to the head of the decedent in the attorney's office, or put pressure on them in the attorney's office, or in the presence of their lifelong friends and tell them, here's what I want you to put in this will. I think undue influence cases, by their very nature, are inferential and circumstantial. And that's why the Supreme Court in Inouye, the estate of Hoover, sanctioned this kind of case. They refer to... I read this case before we... the Hoover case before we tried it, and I thought, this is exactly what we're talking about here. This isn't a direct influence case. This is a subtle, invidious type of influence. And the court used this terminology. That as long as there is some circumstantial evidence which may have operated during the time the will was executed. That's the point. It's not a very heavy standard to get to a jury. And where a fair-minded person... Counsel? Yes. The record seems pretty clear to me that there's little dispute that the decedent loved the respondent. I agree. So we're to believe, if we accept your position, that the respondent gets nothing, and that was the decedent's intention? Nothing under the will, that is. I am not suggesting that it was his intention that she get nothing. What I am suggesting... And that ties into what I had asked opposing counsel. If he dies in test state, the parents, at least from what I can tell from the record, were never even contemplated as taking... as part of the estate. And neither were two of the siblings. And it seems like if this court goes along with your argument, we've completely redone his plan. I have two comments. To the extent he had a plan. Part of the evidence was what he had in life insurance as well. And it would be my suggestion that part of his plan was to name her, and he did name her, as the beneficiary of his life insurance, which she already received. He put her on the joint bank account. He did. So, I don't know what his plan was. Except that I know his plan did not comport with the will that was invalidated here. Kara referred to this buy-sell agreement, which was a major part of the evidentiary disputes in the case. And what he had was a partnership, or a corporation, he was an equal shareholder with Jerry Hamner, who was our first witness. And his plan all along, which he told all of his friends, was if the life insurance from the corporation was to go to his brother, Bob, in the event that Jerry Hamner didn't want Bob as a partner. That was a major part of his plan. That's what he wanted. They had worked together for 30 years. And that was his plan. With respect to his parents, I don't know that there was any plan with his parents. I admit that. But what we believe is that the will did not comport with what he really wanted. But if you win, they're going to get half the estate, right? Correct. The siblings will share half the estate. Is that really our concern? That they'll get half? Isn't our concern whether or not there was enough evidence for the jury to make this finding, and that was the jury's job to do, and they did their job, and we can't go about fixing what the changes will be? I totally agree. And there are many court opinions that render inadmissible what the decedent's plan was in earlier estate planning procedures, whether by will or anything. Sometimes that's prejudicial towards the jury or for the jury. So many courts have rendered that inadmissible. But your conceding then this jury, unless they did some independent research at home by themselves, did not know that their verdict would result in the decedent's property going half to the parents and the other half to the four siblings. I concede that. They did not know that. Should they have known that? No. Why not? Because I believe the only issue before the jury was, was this his last will and testament, his valid last will and testament? I think anything before that, I understand how it could be prejudicial. Because then you have the jury deciding based upon their, you know, their observances of the witnesses and who they like or don't like for whatever reason. In this limited scope, this limited atmosphere, they may decide I don't like that person so I want to know whether she's going to get anything if we do or do not invalidate this will and for that reason I think it is prejudicial and it doesn't go to the jury. That evidence. It's only whether this will comports with his wishes, whether he had testamentary capacity or whether it was the result of undue influence. I think that's the focus. I do have a few more comments on that. First of all, it is clear when you look at this that each of us, and counsel complains in the brief that I have cherry-picked evidence. Of course I've cherry-picked evidence. Of course I cherry-pick it. You know, and so does the appellant. That's what we all do. That's what we did before the jury. There's a complaint about my alleged improper remarks to the jury. Well, I did do a role-play of the decedent from the grave for my closing argument. Entirely proper. And it's based upon reasonable differences to be drawn from the evidence. That's how I characterized it. I told the jury what I was doing and how I was basing, how I was coming up with this. So, what is interesting when you're talking about cherry-picking the evidence is what is in dispute here, but evidence was presented on, is there is no question that Jim reposed trust and confidence in Marita. She lived with him. She helped him with his medication. She wrote the checks for him. Now, she has an excuse or an explanation for why she did that, but the fact is she did. She transported him to and from his activities. She was present during all of the discussions of the contents of the will, other than June 13th, the day it was signed. But if you believe the attorney's testimony, it had already been decided long before June 13th. In fact, her testimony was that in early June. I think it was June 1st. Now, that's contrary to the testimony of Marita Stoltz, which brings it to this point, that there are factual disputes about what happened, and that's why a jury should decide it. Another fact that I am cherry-picking here is, again, in partial recognition of the difficulty of an undue influence case, is when was this influence exerted? Well, what is important is not whether it's not, it doesn't have to be shown that the exertion or the influence was exerted on that day it was signed. The law is that it's important that when the will contents were decided, that's when the influence has to have been exerted. So, early on in the hospital, the testimony was that Marita asked John Schutzbach to leave. There was later testimony that John was Jim's confidant for life. His advisor gave him all kinds of life advice and financial advice. Marita asks him to leave. And then he starts making notes as to what he wants in the will. That comes on, it was an exhibit in the case of some notes that he made in the hospital, that somehow made it to the attorney's desk. I don't know what happened, but a reasonable inference can be drawn that that's when the influence was exerted and that's when the contents of the will were decided. One fact that I cherry picked, absolutely. I'm not going to go into the facts. I have a list of facts that were presented, particularly on the undue influence count, but I think the point is being made. That there are facts that can go either way. There are explanations, there are marginalizations, there are excuses, and there is contrary testimony to almost every point. We had a four day trial with many witnesses. And given that, the only question is whether if you take all of the evidence and the light most favorable to us, can it be said that this jury was wrong? And that's simply not the case. I think it can't be said that the evidence so overwhelmingly favors the defendant that a contrary verdict can't stand. I will admit that the evidence was conflicting. I'll admit that the jury could have gone either way. What the defendant did not request is an alternative verdict form separating the counts. So we don't know whether the jury found that the will was the product of undue influence or whether he lacked testamentary capacity. We don't have that luxury here of knowing it. We don't know. But I would suggest that a reasonable inference can be drawn either way. Judge Reiter and the jury heard the evidence, reviewed all the documents, reviewed the hospice notes which are referred to in my brief. They saw the witnesses with their own eyes, their ability, their memory, the facts they testified to, their manner while testifying, their interests, their bias, their prejudice, all of those things, and they made a decision in light of all that evidence. Counsel did a great job at trial. All of these witnesses were subjected to rigorous cross-examination. Marita was put on the stand twice. And I think when the court considers all of that, this isn't a case in which an opposite conclusion is clearly evident, as would be required for this verdict to be overturned here. This is why we have jury trials. And the verdict of the jury should stand here and the denial of the motion for JMOB should be affirmed. I have one last comment, and that's on the motion for a new trial. It is indeed a different standard. It's an abusive discretion standard. And I think what's important in considering that portion of the motion is this. As stated by the Fifth District Appellate Court, neither the trial court nor the appellate court should sit as a second jury. Granting a new trial merely because the trial court would have reached a different result, where there is evidence which if believed would support the jury's verdict, is an abusive discretion. That's not the case here. Could have gone either way. But it's not this court's job to sit as a second jury. The only question is whether was there evidence to support their verdict, and I would suggest that there was. Thank you, Your Honor. Thank you. Mr. McDevitt. Is there any rebuttal? Yes, briefly. I don't agree that the facts are necessarily in dispute. What I've asked this court to do and what I asked the trial court to do was give them everything they're asking you for. And at the conclusion of that, when you take the law as presented in the cases, when you look at the lack of testamentary capacity, you are completely without any factual evidence of him forgetting his family, forgetting the natural objects of his bounty. You are completely without any evidence that he was unable to recall his assets properly, handle his own affairs properly, at any time, even clear up until his date of death. You are also without any evidence that he was without the capacity to form a disposition of his assets. So with everything that was given to the jury, everything that was given to the judge, and again to you now, I'm saying when you review the transcripts, when you review the evidence and the like, most favorable to the plaintiff, there's no support for lack of testamentary capacity. In addition, when you take the rules with respect to undue influence, you also are without sufficient information to find dependence, dominance, or meritus participation in the procurement of the will. Each of the cases cited for you either dismiss a complaint, grant a directed verdict, or enter a J&OB. So in some respect, they were not given to the jury, which I think in this case was appropriate simply because there was no evidence of dependence, there was no evidence of dominance, and even more importantly, there's no evidence she participated in any way, shape, or form apart from presence at the initial meeting in the procurement of the will. The cases are very clear. That alone is insufficient. And so in this particular instance, when Mr. Schutzbach independently made contact with this attorney, talked to her, while Marita was present, looked at Marita at one point in time, and she says, the only testimony of her participation is it's up to you, it's yours, I have nothing to do with it. He then leaves, she leaves that meeting, the attorney leaves the meeting, then what we have are a flurry of phone calls back and forth between the decedent and the attorney, then we have a meeting on the 1st, where we sign a power of attorney, and we have another meeting on the 13th where the will is signed. Marita's sitting outside, she drove him, but she was not participating. All of the cases make it clear in order to find undue influence, there must have been some participation in the procurement of that will. The record is completely devoid of that, and that is why I believe in this case the jury's verdict was a complete miscarriage of justice because she did not participate, and that's a requirement for finding undue influence. Those are the two reasons. The facts I do not agree are in dispute. I've said from the beginning, give them what they're asking for, and that's why in this case I've repeatedly asked the judiciary to intervene, because at the end of it, I do not believe this is consistent with basically the three rules that I understand, a will is presumed valid, a will in favor of a significant other is presumed valid, and the testator is presumed sane, and so it's hard for me now to sit across from decedents and say your will will be presumed valid and your family cannot overturn it, and that's why I'm asking for the J&OB is to make it easier, public policy-wise, for attorneys to give them that assurance. Thank you. Thanks to both of you. The case is submitted. The court stands in recess.